FRANK PALUMBO *vs.* OLYMPIA THEATRES, INC.

Suffolk.     May 11, 1931. — June 23, 1931.

Present: CROSBY, PIERCE, CARROLL, WAIT, & FIELD, JJ.

*Landlord and Tenant*, Eviction, Quiet enjoyment.

Where a dentist, tenant under a lease in writing of an office over a theater, delayed for eleven months to abandon the leased premises because certain lights, placed outside his window with the landlord's permission, made the leased premises untenantable for the purpose for which they were let to him, he could not maintain an action against the landlord for a constructive eviction.

TORT OR CONTRACT.     Writ dated October 4, 1927.

In the Superior Court, the action was tried before *Brown,* J.     Material evidence is stated in the opinion.     At the close

of the evidence, the plaintiff elected to rely only on a count in contract.

After the recording of a verdict for the plaintiff in the sum of $4,100 subject to leave reserved under G. L. c. 231, § 120, the judge ordered the entry of a verdict for the defendant. The plaintiff alleged exceptions. There also were exceptions saved by the defendant which were immaterial, since the plaintiff's exceptions were overruled.

*W. B. Keenan,* (*J. A. Treanor, Jr.,* with him,) for the plaintiff.

*Lee M. Friedman,* (*F. L. Kozol* with him,) for the defendant.

PIERCE, J. This is an action by a tenant against his landlord to recover damages for the alleged breach of an implied covenant of quiet enjoyment under a lease. The plaintiff's declaration was in two counts; one in tort and the other in contract. At the conclusion of the evidence the judge required the plaintiff to elect on which count he would proceed, and he elected to go forward on the count in contract. After the bringing in of a verdict for the plaintiff, the judge, under leave reserved, entered a verdict for the defendant, to which the plaintiff duly saved an exception. Certain exceptions were taken by the defendant relating to the admissibility of evidence, to the refusal of the judge to give certain instructions and to the instructions given. These exceptions become material in the event this court sustains the plaintiff's exceptions to the entering of a verdict for the defendant.

In its aspect most favorable to the plaintiff's contentions, the evidence discloses that the plaintiff leased a room on the third floor in the defendant's building in Scollay Square, Boston, for three years from August 1, 1921. The lease was extended upon identical terms by successive agreements, the last, the one in issue, being for a term of two years from August 1, 1925. The lease provided that the lessee "will use and occupy said premises only for his business as operating dentist only and will not assign this Lease nor underlet the whole or any part of the said premises." The plaintiff's room was right above the arch of an entrance to a

theater on the ground floor of the building. It has three windows all facing Scollay Square. Before he took his lease there were electric signs on the building, not in front of his office; the front of the building was at all times studded with electric lights; the theater had all the lights they could put around it in the theater archway right below his windows; there is another theater next door which also had lights; the exterior of both those theaters was a gayly lighted neighborhood in the evening. No artificial light came into the plaintiff's windows from the outside before the erection of the sign hereinafter referred to.

On April 8, 1926, the defendant put up an electric sign which extended about two or three feet away from the front of the building, outside the windows of the leased room, the whole length of the building. The entire length of the sign had "Scollay Square Olympia" on it in exceptionally big letters. The letters were lighted. For two or three days after the lights were put on they were white, then they were changed to yellow lights; then blue lights were tried and finally orange lights. The plaintiff could not work at all when these last-named lights were on. All the bulbs were painted orange and yellow. The lights constantly blinked, constantly going on and off. All the lights were on the side; they blinked, then one light would go out and travel all the way around; the lights did not always go all the way around but they blinked all the time. The light was never a steady one, and it interfered with the plaintiff's light, particularly at night. He could not do any work at all. The sign was lighted most of the day as well as the night, and interfered with the work of the plaintiff in the daytime about the same as at night. After the sign had been up a very short while the plaintiff noticed that his eyes were getting rather weak; he could not seem to see a definite field; he had never had difficulty in seeing in any part of the mouth in a definite way, but after the light was put there he had difficulty in getting down to fine work; it affected his eyes. Outside of interfering with his carrying out the operations in the chair, the light interfered with

his own eyes. He tried pulling down the curtains on a couple of occasions; it helped a little but not enough; it was disagreeable to work with the curtains down and had a bad effect on the patients.

The plaintiff testified that "at the beginning the sign was worse because they put up different colored lights from time to time; there were various colors there; he knows they had men out there every day at the beginning working right out there; he saw them putting up the sign; he allowed them to use his place in the evening for putting up the sign; he refused to have them come in to his office at all; then Street [who was manager for the defendant] came down and persuaded him to give consent, that the theatre people had taken over the building, etc., and so on; he [the plaintiff] said, 'Well, if they don't interfere with my business, all right'; he thought a man came in at four o'clock in the morning or whatever it was and instead of taking them a couple of hours they were there quite a little while; that lasted for some little time while the sign was being erected." In April, 1926, when the sign was in process of erection, he made objections to Street by calling him up and telling him about it. Street came down to the office of the plaintiff and the plaintiff said: "What am I going to do here with this sign up?" Street said: "That sign won't interfere with you. You won't have any electric light bills, at all"; and the plaintiff said: "I can't work if all those lights are going to come in my face," and Street said: "The theatre people have taken over the building and we have not got much to say now." The plaintiff further testified that at "that time he did not know what the lights were going to be but could see the structure as it was in the framework; the lights were not completed when he made the objection."

From April, 1926, to February, 1927, particularly about a month after the lights were up, the plaintiff looked around for another office in the immediate locality. He went to three or four places and finally located on Cambridge Street. On January 20, 1927, he sent a notice to the agents of the defendant informing them of his objection and that he

intended to hold them liable. The rent was payable in advance and the plaintiff paid the rent up to March 1, 1927. He testified that "nobody asked him to move; he did it on his own arrangement and judgment; he knew that his lease expired at the end of July, 1927; all he did was to move on the first of March instead of the first of August; his lease was up August 2; he moved March 1, 1927."

Assuming all facts to be true which the jury could warrantably have found upon the reported evidence, and that such facts were in their nature of such permanent character as would constitute an eviction if they were done by the defendant with the intention and effect of depriving the plaintiff of the enjoyment of the premises demised, the question at issue here is, Did the plaintiff yield and abandon the premises within a reasonable time? *Voss* v. *Sylvester*, 203 Mass. 233, 240. *Callahan* v. *Goldman*, 216 Mass. 238. *Goldberg* v. *Horan*, 263 Mass. 302, 304–305. Reasonable time is ordinarily a question of fact for the jury, *Rome* v. *Johnson*, 274 Mass. 444, 450–451, but where the facts are all undisputed the question is one of law, *American Steam Gauge & Valve Manuf. Co.* v. *Mechanics Iron Foundry Co.* 214 Mass. 299, 301; *Lincoln* v. *Croll*, 248 Mass. 232, 233. Compare *Kelley* v. *Thomas G. Plant Corp.* 274 Mass. 102, 105. Here, on the undisputed facts, the sign was placed in the position complained of on April 8, 1926, and the lights then were used even to a more objectionable extent than later, according to the plaintiff's testimony. In the beginning the plaintiff must have realized that it was the intention of the defendant to keep the sign there and use the electric lights permanently. He testified that when the sign was being erected he complained to the manager of the building about the possible interference with his work and he was told: "The theatre people have taken over the building and we have not got much to say now." The plaintiff, after his conversation with the manager, could not reasonably have remained with any hope of improvement. This fact distinguishes the case from *Rome* v. *Johnson*, 274 Mass. 444, and *McCall* v. *New York Life Ins. Co.* 201 Mass. 223, upon which the plaintiff relies. Here the plaintiff remained in possession

for about eleven months after the acts complained of. If he chose to treat the acts of the defendant as a constructive eviction he should have abandoned the premises within a period shorter than eleven months.

*Plaintiff's exceptions overruled.*
*Defendant's exceptions overruled.*